# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

**BY:** ☐ COMPLAINT ☐ INFORMATION ☒ INDICTMENT ☐ SUPERSEDING

**OFFENSE CHARGED**
18 U.S.C. § 1343 – Wire Fraud;
15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud;
18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in Federal Investigations
18 U.S.C. §§ 981, 982; 28 U.S.C. § 2461(c) – Forfeiture

☐ Petty ☐ Minor ☐ Misdemeanor ☒ Felony

**PENALTY:** See attached penalty sheet.

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

**DEFENDANT - U.S**
▶ ABRAHAM SHAFI

**DISTRICT COURT NUMBER**
CR25-00258 AMO

**FILED**
Aug 27 2025
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District) _____

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction } ☐ Federal ☐ State
6) ☐ Awaiting trial on other charges
   If answer to (6) is "Yes", show name of institution _____

Has detainer been filed? ☐ Yes ☐ No } If "Yes" give date filed _____

**DATE OF ARREST** ▶ Month/Day/Year _____
Or... if Arresting Agency & Warrant were not
**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year _____

## PROCEEDING

**Name of Complaintant Agency, or Person (& Title, if any)**
FBI (SA Jennifer Trott)

☐ person is awaiting trial in another Federal or State Court, give name of court _____

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District _____

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY ☐ DEFENSE
**SHOW DOCKET NO.** _____

☐ this prosecution relates to a pending case involving this same defendant
**MAGISTRATE CASE NO.** _____

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under _____

**Name and Office of Person Furnishing Information on this form** CRAIG H. MISSAKIAN
☒ U.S. Attorney ☐ Other U.S. Agency

**Name of Assistant U.S. Attorney (if assigned)** S. Paidipaty / E. Mateer

☐ This report amends AO 257 previously submitted

---

**ADDITIONAL INFORMATION OR COMMENTS**

**PROCESS:**
☐ SUMMONS ☐ NO PROCESS* ☒ WARRANT    **Bail Amount:** No Bail

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

**Defendant Address:**
_____

**Date/Time:** _____    **Before Judge:** _____

**Comments:**

<u>*United States v. Abraham Shafi*</u>

**Penalty Sheet**

<u>Wire Fraud (18 U.S.C. § 1343) (Counts 1-6)</u>

- Maximum term of imprisonment: 20 years
- Maximum term of supervised release: 3 years
- Maximum fine: $250,000 or twice the gross gain or loss from the offense
- Mandatory special assessment: $100 (per count)
- Potential restitution and/or forfeiture

<u>Securities Fraud (15 U.S.C. § 78j(b) and 78ff; 17 C.F.R. § 240.10b-5) (Count 7)</u>

- Maximum term of imprisonment: 20 years
- Maximum term of supervised release: 3 years
- Maximum fine: $250,000 or twice the gross gain or loss from the offense
- Mandatory special assessment: $100
- Potential restitution and/or forfeiture

<u>Destruction, Alteration, or Falsification of Records in Federal Investigations (18 U.S.C. § 1519) (Count 8)</u>

- Maximum term of imprisonment: 20 years
- Maximum term of supervised release: 3 years
- Maximum fine: $250,000
- Mandatory special assessment: $100
- Potential restitution and/or forfeiture

FILED
Aug 27 2025
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

# United States District Court

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

VENUE: OAKLAND

CR25-00258 AMO

UNITED STATES OF AMERICA,

V.

ABRAHAM SHAFI,

DEFENDANT(S).

## INDICTMENT

18 U.S.C. § 1343 – Wire Fraud;
15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud;
18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in Federal Investigations
18 U.S.C. §§ 981, 982; 28 U.S.C. § 2461(c) – Forfeiture Allegation

A true bill.

/s/ Foreperson of the Grand Jury
                                                    Foreman

Filed in open court this  26th  day of

August 2025.

Brenda Lopez, Deputy Clerk

Bail, $ No Process

Hon. Sallie Kim, U.S. Magistrate Judge

1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   LORINDA I. LARYEA
3  Acting Chief, Fraud Section

FILED

Aug 27 2025

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| UNITED STATES OF AMERICA, | CASE NO. CR25-00258 AMO |
|---|---|
| Plaintiff, | VIOLATIONS: |
| v. | 18 U.S.C. § 1343 – Wire Fraud; |
| ABRAHAM SHAFI | 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud; |
| Defendant. | 18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in Federal Investigations |
|  | 18 U.S.C. §§ 981, 982; 28 U.S.C. § 2461(c) – Forfeiture Allegation |
|  | OAKLAND VENUE |

INDICTMENT

The Grand Jury charges:

At all times relevant to this Indictment:

Overview

1.   In the Spring of 2021, technology startup Get Together Inc., which distributed a social media app called "IRL," raised $170 million in its Series C fundraising round at a valuation of over $1 billion. As part of the transaction, Defendant Abraham SHAFI ("SHAFI"), IRL's founder and CEO, sold approximately $7.5 million in stock and the transaction valued his remaining shares at many millions more. But the Series C investment into Get Together ("IRL") was induced by SHAFI's fraudulent scheme to mislead investors about IRL's user base and marketing spending.

INDICTMENT

2. During the investment process, SHAFI assured investors that IRL achieved its purported user base despite spending "virtually zero" on marketing, that the company grew predominantly through direct SMS based invites wherein users "were not incentivized or paid," and that the company spent "about $50K a month in paid user acquisition." These statements were false. Since in or around 2019, IRL had been spending millions of dollars on incent advertisements ("incent ads"), which are a marketing tool that offers users incentives (usually in the form of currency in a separate application) to download the IRL application. Users who join a social media platform via incent ads are less valuable than users brought in without incentives because they are less likely to be longtime and invested users of the platform. In the months leading up to the Series C round, IRL spent hundreds of thousands of dollars per month on incent ads, and in December 2020 (just a few months before telling investors that IRL spent $50,000 per month on paid user acquisition), SHAFI complained to an incent ads vendor: "I spend millions with you . . . I expect some basic treatment."

3. After obtaining the Series C investment, SHAFI continued to hide IRL's incent ad expenditures from investors, others in the company, and the board. He did so by funneling IRL's incent ad payments through a third-party company, and directing the owner of that company to send falsified invoices to IRL's CFO that obscured the incent ad spending.

4. In or around 2022, the Division of Enforcement of the Securities and Exchange Commission ("SEC") opened an investigation into Get Together, the company behind IRL. As part of its investigation, in August 2022, the SEC issued subpoenas for records and testimony to IRL, SHAFI, and others. In response, SHAFI obstructed justice by, among other things, instructing Individual 1 to delete and/or change the names of various computer files, directing Individual 1 to lie during an internal investigation, and by restoring SHAFI's phone to a previously saved backup – resulting in the deletion of most of the data on the phone – approximately three days before it was to be imaged as part of the internal investigation.

Relevant Individuals and Entities

5. SHAFI resided in the Northern District of California and the District of Hawaii. SHAFI was the founder and Chief Executive Officer at IRL, a social media company founded in or around 2018 that, until in or around June 2023, produced and promoted a social networking application. The

INDICTMENT 2

1  application was a platform for users to connect online and then meet at in-person events as well as
2  remotely.
3      6.    Investor 1 was an investment holding company headquartered in Tokyo, Japan, with
4  offices in the United States. Investor 1 invested approximately $150 million in IRL in or around May
5  2021 as part of IRL's Series C.
6      7.    Investor 2 was a venture capital firm that was founded in Burlingame, California.
7  Investor 2 invested approximately $10 million in IRL in or around May 2021 as part of IRL's Series C.
8  Investor 2 previously invested in IRL in or around September 2020 as part of IRL's Series B. After the
9  Series B, a representative of Investor 2 joined IRL's Board of Directors.
10     8.    Incent Ad Company 1 was a vendor that provided mobile advertising marketing services
11 and provided such services to IRL since at least in or around September 2019.
12     9.    Individual 1 was an associate of SHAFI who helped SHAFI purchase incent ads for IRL.
13 Individual 1 later became an employee of IRL.
14     10.   Entity 1 was a company owned by Individual 1 through which SHAFI and Individual 1
15 purchased incent ads for IRL.

                                   The Scheme to Defraud

17     11.   From a time unknown but no later than in or around September 2019 and through in or
18 around June 2023, SHAFI engaged in a scheme, plan, and artifice to defraud IRL investors as to a
19 material matter, and obtain money and property by means of materially false and fraudulent pretenses,
20 representations, and promises, and failing to disclose material facts with a duty to disclose.
21     12.   Beginning in or around September 2019, SHAFI knowingly and intentionally made
22 materially false and misleading statements to investors and failed to disclose material facts, using the
23 following manner and means, among others: (1) causing IRL to spend millions of dollars on incent ads
24 between in or around 2019 and in or around 2023, (2) communicating false and misleading information
25 to potential investors regarding IRL's user acquisition spend, marketing practices, and download
26 statistics, (3) causing false invoices to be created and sent to IRL's CFO and other employees to conceal
27 IRL's use of incent ads, (4) using significant amounts of fraudulently-obtained investor funds for
28 personal expenses for SHAFI and his significant other, such as luxury hotel stays, luxury clothing,

INDICTMENT                                    3

purchases from home furnishing retailers, thousands of dollars for art classes, and hundreds of thousands of dollars for SHAFI's wedding, including payments for wedding guests' airfare and luxury hotels; (5) concealing his material misrepresentations by creating or causing others to create false documents, destroying relevant records, and instructing others to lie to investigators.

13. The purpose of the scheme to defraud was for SHAFI to mislead investors and potential investors in IRL about IRL's user acquisition spend, marketing practices, and download statistics in order to (a) obtain money and property from investors through the Series C fundraising; and (b) unjustly enrich SHAFI through the receipt of Series C funding.

*SHAFI directs IRL's incent ad spending*

14. In or around September 2019, SHAFI contacted an incent ad company and stated: "I have been unable to get any movement on iOS installs in the US . . . I have a budget of $3k a day with a goal of .5 installs in the US. I can commit to a consistent $3k a day for a few months at least if we can get something to work." That same month, SHAFI entered into a contract with a different incent ad company, Incent Ad Company 1. The contract outlined the types of advertising that Incent Ad Company 1 was authorized to use for IRL's account and the types of advertising that it was prohibited from using. Specifically, the contract approved use of incent ads and restricted use of "Push Notifications" or ads via "SMS" and "Emailing." SHAFI arranged for payments to Incent Ad Company 1 to be made through a third-party entity such that the incent ad expenditures did not appear on IRL's books. Through this, SHAFI ensured that these payments to the third-party entity were concealed, appearing on IRL's general ledger as payments for "consulting."

15. Throughout 2020, SHAFI continued to direct IRL's incent ad spending. For example, on or about March 26, 2020, he told an Incent Ad Company 1 sales representative that he wanted to spend $5,000 a day for incent ads. On or about July 15, 2020, Incent Ad Company 1 confirmed with SHAFI that his goal was to drive approximately 12,000 daily installations on iOS devices and 6,500 installations on Android devices. SHAFI's spending on Incent Ad Company 1 continued to increase in or around mid-2020, as SHAFI told a sales representative in or around August 2020 that IRL "want[s] to reach number 1" in the Apple App Store. On or about December 1, 2020, SHAFI expressed frustration with Incent Ad Company 1, telling a representative in a chat that "I spend millions with you…I expect some

INDICTMENT                                4

basic treatment."

16. Throughout 2020 and early 2021, SHAFI arranged for IRL to spend hundreds of thousands of dollars per month on incent ads, but masked the true nature of the spending in IRL's books and records. In or around November 2020, SHAFI hired Individual 1, through Entity 1, to assist with IRL's growth. At SHAFI's direction, Individual 1 began managing IRL's incent advertising, which included payment and coordination with Incent Ad Company 1. This allowed SHAFI to continue concealing IRL's spending on incent advertising, instead funneling it through Entity 1.

*SHAFI makes false statements regarding IRL's marketing spend and use of incent ads in connection with IRL's Series C fundraising round*

17. In or around early 2021, SHAFI began preparations for a Series C investment round for IRL. During this time, SHAFI continued to orchestrate IRL's spending on incent ads. For example, on or about March 14, 2021, SHAFI asked Incent Ad Company 1 about doing a "big burst" of advertising for "a few days" and agreed to increase the amount IRL paid per ad to drive up to 13,000 in daily installs. Two days later, on or about March 16, 2021, an employee of Investor 2 noted to SHAFI that a potential investor would love that IRL "spent virtually zero on marketing and got to 12M MAU [12 million Monthly Active Users]," to which SHAFI responded: "Thats us! Real social."

18. On or about April 13, 2021, SHAFI sent a pitch deck, via email, to Investor 1. On or about April 19, 2021, SHAFI responded via email to a series of diligence questions posed by a representative from Investor 1. When asked about IRL's user acquisition channels, SHAFI falsely responded:

> The dominant invite flow today is first to groups and second to events. We grow predominantly through direct SMS based invites from one user to another. This is a free organic channel (users are not incentivize or paid for these invites, and must invite each friend individually with no bulk invites). Unlike other apps that spend aggressively to acquire new users, we spend very little (see below). Thanks to our organic channels, we have maintained our position as a top 20 social app in the US for most of the last year, at times breaking into the top 10.

19. On or about April 19, 2021, when asked by Investor 1 about paid user acquisition, SHAFI falsely responded, via email: "We spend about $50K a month in paid user acquisition." At the time SHAFI made this statement, he knew that IRL was spending at least double that in incent ads alone.

INDICTMENT                                5

20. These statements were materially false representations. In fact, IRL did incentivize users to download the application via incent ads, did spend aggressively to acquire new users, and its position in the app rankings was due in significant part to IRL's incent ad spending. Furthermore, as SHAFI knew and directed, IRL spent hundreds of thousands of dollars per month in incent ads, well more than the $50K a month in paid user acquisition he described to investors.

21. On or about April 21, 2021, a representative from Investor 1 asked SHAFI why there was a significant spike in IRL's downloads in September 2019 that carried through October and November 2019. That same day, SHAFI responded via email: "The spike in 2019 was due to seasonality around the holidays…" This statement was a materially false representation, as SHAFI did not disclose that September and October 2019 was when SHAFI began IRL's first incent ad campaign, which contributed to an increase in downloads at the time.

22. On or about April 28, 2021, a representative from Investor 1 asked SHAFI additional diligence questions relating to IRL's spending on user acquisition and the channels used for user acquisition. In response, SHAFI put together a document containing talking points that were conveyed to Investor 1 on a phone call the following day. Those talking points confirmed that IRL spent no more than $50,000 in monthly spend on user acquisition. SHAFI also listed four paid marketing vendors that made up the user acquisition spend, which did not include Incent Ad Company 1, or any incent ad company.

23. After receiving false and misleading statements and misrepresentations from SHAFI, on or about May 18, 2021, the Series C funding round closed with the signing of a Preferred Stock Purchase Agreement wherein Investor 1 purchased approximately $125 million in Preferred Shares and approximately $25 million in Secondary Shares and Investor 2 purchased approximately $10 million in Preferred Shares. Contemporaneous with the close of this funding round, SHAFI sold approximately $7.5 million in his own stock options.

24. Investors in IRL's Series C offering, including Investor 1 and Investor 2, were issued shares of Get Together Inc. stock, and those shares constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5. SHAFI's misrepresentations were in connection with the purchase and sale of Get Together Inc. shares.

INDICTMENT                                     6

*SHAFI continues to hide IRL's incent ad spending after the Series C fundraising round*

25. SHAFI continued to spend hundreds of thousands of dollars per month on incent ads for IRL throughout 2021 and 2022, paying the expenses through Entity 1 and concealing the true purpose of the payments. After closing its Series C round, IRL hired a Chief Financial Officer (CFO). Shortly after assuming this new role, the CFO asked SHAFI questions about IRL's payments to Entity 1. In response, SHAFI directed Individual 1 to create false invoices concealing the use of incent ads entirely. The false invoices indicated that most of the money IRL paid to Entity 1 was for infrastructure costs (called infra costs") for expenses related to Amazon Web Services ("AWS"), Short Message Service ("SMS"), and Google Cloud costs, with only a small portion of the payments reflected as advertising costs (but not incent ads). In fact, the vast majority of the money paid to Entity 1 was spent on incent ads and the false invoices falsely represented that the vast majority of Entity 1's spending was on overhead expenses such as AWS servers and SMS costs rather than incent ads. The purpose of the false invoices was to conceal SHAFI's scheme to defraud Series C investors and the fact that IRL, at SHAFI's direction, was continuing to spend hundreds of thousands of dollars per month on incent ads.

26. In or around August 2022, the SEC issued a subpoena to IRL, SHAFI, and others covering a variety of topics, including user metrics and vendor payments.

27. After receiving the SEC subpoena, SHAFI continued to conceal the true incent ad spending at IRL. On or about September 28, 2022, SHAFI sent an email to a representative of Investor 1 stating that IRL had mischaracterized its "infrastructure" and "growth" spending in its financial statements. In the email, SHAFI characterized the problem as a categorization issue – the company had put most of its paid advertising spend under "Infrastructure," but it should have been categorized as "Growth." In a follow up discussion, SHAFI told an Investor 1 representative that the paid acquisition had been characterized under "infrastructure" because the majority of it had been spent on SMS ads, which require extensive infrastructure bandwidth to support. SHAFI made similar statements to a representative from Investor 2. These statements were false, as these expenses were largely for incent ads, not SMS ads. At no time during this period did SHAFI tell the investors that the majority of the paid ad spend being booked as "growth" was for incent ads.

INDICTMENT                                                                7

*SHAFI's use of company funds for personal expenses*

28. From in or around 2019 through in or around 2022, SHAFI spent over $1 million in IRL funds on personal expenses. Prior to the Series C round closing,, SHAFI and his romantic partner used IRL funds to make hundreds of thousands of dollars of personal expenditures. These personal expenditures included luxury hotel stays, purchases from home furnishing retailers, thousands of dollars for art classes, air purification services, grocery bills, and payments to SHAFI's romantic partner's family and friends. SHAFI's use of IRL funds for personal expenses was not disclosed to investors before the Series C fundraising round.

29. After obtaining investor money by making false and misleading representations during the Series C fundraising round, SHAFI's use of company funds for personal expenses continued. SHAFI and his partner spent hundreds of thousands of dollars in company funds on their April 2022 wedding, including expenditures on party rentals and luxury hotel rooms for wedding guests in Hawaii. Additional personal expenses with company funds included: thousands of dollars in clothing expenses at high-end retailers; approximately $15,000 to a furniture store; tens of thousands of dollars for a trip to Japan in summer 2022; and thousands of dollars in grocery expenses, Amazon deliveries, electrical bills, veterinarian bills, and other similar personal expenses. .

*SHAFI obstructs the SEC's investigation of IRL*

30. In or around August 2022, the SEC issued subpoenas for records and testimony to IRL, SHAFI, Individual 1, and others. Shortly after receiving the subpoena, SHAFI initiated a chat and call with Individual 1. During this communication, SHAFI instructed Individual 1 to log in to Social Media 1's document management system and change the titles of several documents, as well as to delete data from at least one spreadsheet, for the purpose of shielding those documents from the SEC's investigation.

31. In or around September 2022, Individual 1 was scheduled to be interviewed as part of IRL's internal investigation in response to the SEC subpoena. Two interviews of Individual 1 were scheduled. Before the second interview, SHAFI informed Individual 1 that the false invoices would come up and pressured Individual 1 to state that he was fully responsible for the false invoices, and that SHAFI had no involvement. After the interview, and after learning that Individual 1 had provided

INDICTMENT                                    8

information about SHAFI's involvement in the false invoices, SHAFI berated Individual 1.

32. To respond to the SEC subpoena and collect responsive documents, between November 2022 and April 2023, personnel working at the behest of IRL's board attempted to image phones belonging to SHAFI and other employees. On or about November 9, 2022, knowing that the SEC had issued a subpoena for information that would be found on his phone, SHAFI restored his phone to a previously saved backup. Restoring a phone deletes all current data and content, including data, settings, contacts, messages, etc. and will restore all settings to a previous backup that had been previously saved elsewhere, such as a cloud storage space. The physical device, then, only retains information from that backup. Two days later, on or about November 11, 2022, SHAFI's phone was imaged as part of the internal investigation. When asked about wiping or resetting digital devices during his sworn SEC testimony, SHAFI falsely denied having restored his iPhone after having received the SEC's subpoena in August of 2022.

COUNTS ONE THROUGH SIX: (18 U.S.C. § 1343 – Wire Fraud)

33. Paragraphs 1 through 32 of this Indictment are re-alleged and incorporated as if fully set forth here.

34. From a time unknown but no later than in or around September 2019 through in or around April 2023, within the Northern District of California and elsewhere, the defendant,

ABRAHAM SHAFI,

knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, and for the purpose of executing the aforementioned scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communications, certain writings, signs, signals, pictures, and sounds, that is electronic funds transfers and payments, or stock purchase orders transmitted in interstate commerce, on or about the dates as set forth below:

INDICTMENT                                                   9

| Count | Date | Wire Transmission |
|---|---|---|
| 1 | 5/18/2021 | Wire transfer of approximately $124,850,044.34 from Investor 1's bank account, routed through the United Kingdom to IRL's bank account in San Francisco, California. |
| 2 | 5/18/2021 | Wire transfer of approximately $9,999,999.03 from Investor 2's bank account, routed through New Jersey and Texas, to IRL's bank account in San Francisco, California. |
| 3 | 4/13/2021 | Email from SHAFI to representatives of Investor 1, routed through servers outside of California and viewed in the Northern District of California, containing IRL's Series C pitch deck. |
| 4 | 4/19/2021 | Email from SHAFI to representatives of Investor 1, routed through servers outside of California and viewed in the Northern District of California, containing link to document containing SHAFI's description of IRL's user acquisition spending. |
| 5 | 4/21/2021 | Email from SHAFI to representatives of Investor 1, routed through servers outside of California and viewed in the Northern District of California, containing description of IRL's user metrics in the fall of 2019. |
| 6 | 9/28/2022 | Email from SHAFI to representatives of Investor 1, routed through servers outside of California and viewed in the Northern District of California, containing a link to a document containing SHAFI's description of IRL's expense categorization. |

All in violation of Title 18, United States Code, Section 1343.

COUNT SEVEN: (15 U.S.C. § 78j(b) and 78ff; 17 C.F.R. § 240.10b-5 – Securities Fraud)

35. Paragraphs 1 through 32 of this Indictment are re-alleged and incorporated as if fully set forth here.

36. Beginning at an unknown date, but no later than in or around September 2019, and continuing to in or around April 2023, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendant,

ABRAHAM SHAFI,

willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances

INDICTMENT                                    10

by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, specifically, the use of the above devices, schemes and artifices to defraud, false statements and omissions of material facts, and acts of fraud and deceit in connection with a securities offering to investors, namely, IRL's Series C Stock Offering entered into on or about May 18, 2021.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNT EIGHT: (18 U.S.C. § 1519 – Destruction, Alteration, or Falsification of Records in Federal Investigations)

37. Paragraphs 1 through 32 of this Indictment are re-alleged and incorporated as if fully set forth here.

38. On or about November 9, 2022, in the Northern District of California and elsewhere, the defendant,

ABRAHAM SHAFI,

did knowingly alter, destroy, mutilate, conceal, cover up, falsify, or make a false entry in a record, document, or tangible object with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction the Securities and Exchange Commission, a department and agency of the United States, by restoring his cell phone to prior backup before imaging as part of internal investigation.

All in violation of Title 18, United States Code, Section 1519.

FORFEITURE ALLEGATION:     (18 U.S.C. §§ 981, 982; 28 U.S.C. § 2461)

39. The allegations contained in this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States Code, Section 2461.

40. Upon conviction for any violations alleged in Counts One through Eight, as set forth in

INDICTMENT                                     11

1 | this Indictment, the defendant,

2 | ABRAHAM SHAFI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a) and 982(a), and Title 28, United States Code, Section 2461(c), all proceeds and property, real or personal, traceable to, constituting, or derived from proceeds the defendant obtained directly and indirectly as the result of those violations, including, but not limited to, a forfeiture money judgment.

42. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

//
//
//
//
//
//
//
//
//
//
//

INDICTMENT                                      12

1 | All pursuant to Title 18, United States Code, Sections 981 and 982, and Title 28, United States
2 | Code, Section 2461(c); Title 21, United States Code, Section 853; and Federal Rule of Criminal
3 | Procedure 32.2.

4 | DATED: August 26, 2025                                         A TRUE BILL.

6 |                                                                 /s/ Foreperson
7 |                                                                 FOREPERSON

8 | CRAIG H. MISSAKIAN
9 | United States Attorney

10 | /s/ Sailaja Paidipaty / Evan Mateer
   | SAILAJA M. PAIDIPATY
11 | EVAN M. MATEER
   | Assistant United States Attorneys
12 |

13 | LORINDA I. LARYEA
   | Acting Chief, Fraud Section
14 | U.S. Department of Justice

15 |
   | /s/ Laura Connelly
16 | LAURA CONNELLY
   | Acting Assistant Chief

INDICTMENT                              13